Justin Sobodash, State Bar No. 217450
LAW OFFICE OF JUSTIN SOBODASH, P.C.
8335 West Sunset Boulevard, Suite 366
West Hollywood, California 90069
Telephone: (310) 729.2184
Facsimile: (323) 656.7155
justin@sobodashlaw.com

Attorney for Plaintiff 76 & BEYOND, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 76 & BEYOND, LLC, a Pennsylvania limited liability company,<br><br>Plaintiff<br><br>v.<br><br>ARCLIGHT FILMS INTERNATIONAL PTY, LLC, a California limited liability company; and DOES 1-10, inclusive<br><br>Defendants | Case No.:<br><br>**COMPLAINT FOR:**<br>**(1) COPYRIGHT INFRINGEMENT;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) BREACH OF CONTRACT;**<br>**(4) DECLARATORY RELIEF; and**<br>**(5) INJUNCTIVE RELIEF**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff 76 & Beyond, LLC ("76 & Beyond" or "Plaintiff") by and through its counsel, hereby allege against defendant Arclight Films International Pty, LLC ("AFIP Defendant") and Doe defendants 1 through 10, inclusive (collectively, "Defendants") as follows:

/ / /

/ / /

## NATURE OF THE ACTION

1. As set forth in this action and a forthcoming companion action concerning the motion picture *Deep Water*, defendant Arclight Films International Pty, LLC and several affiliated Arclight film production entities are serial fraudsters and infringers who purport to grant the same intellectual property rights in motion pictures when they mismanage (or worse) their film production schedules and budgets.

2. In this action, plaintiff 76 & Beyond establishes its first priority in all intellectual property and other rights in the yet-to-be released film *The Canyon*, starring Mel Gibson and Bella Thorne.

3. Defendants pledged a first priority interest in all intellectual property and other collateral in *The Canyon* picture, securing 76 & Beyond's bridge loans to AFIP Defendant.

4. Those loans are long been past due, and Defendants are infringing 76 & Beyond's reproduction and distribution rights.

5. Defendants are infringing 76 & Beyond's reproduction and distribution rights by their dealings with third party distributors wherein Defendants purport to license or assign copyright interests which Defendants are barred from licensing or assigning. Accordingly, 76 & Beyond is forced to bring this action.

## THE PARTIES

6. Plaintiff 76 & Beyond, LLC is a Pennsylvania limited liability company doing business in Bala Cynwyd, Pennsylvania.

7. Defendant Arclight Films International Pty, LLC ("AFIP" or "Defendant AFIP") is a California limited liability company with its principal place of business in Beverly Hills, California.

8. Plaintiff is informed and believes, and based thereon alleges, that the anonymously and fictitiously named Doe Defendants 1 through 10

inclusive, are either individuals or legal entities acting in concert with the named defendants. Plaintiff is further informed and believes, and based thereon alleges, that Doe Defendants 1 through 10, inclusive are individuals and legal entities residing or doing business in various locations who have advanced unlawful and harmful schemes alleged herein in County of Los Angeles, California.

9. Plaintiff is presently unaware of the true names and capacities of Doe Defendants 1 through 10 who are sued herein, and therefore sue said defendants by only fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when their names and capacities have been ascertained . Plaintiff is further informed and believes, and based thereon alleges, that each of the fictitiously named Doe Defendants 1 through 10, inclusive, is responsible in some manner for the occurrences, acts, and omissions alleged herein and that his extensive damages have been and continue to be proximately caused by their conduct

10. Plaintiff is further informed and believes, and based thereon alleges, that at all times material hereto, all Defendants, including Doe Defendants 1 through 10, inclusive, were and are agents, employees, partners, joint venturers, co-conspirators, owners, principals, and employers of each other, and at all times herein mentioned have acted within the course and scope of that agency, employment, partnership, conspiracy, ownership, or joint venture. Plaintiff further alleges based on information and belief that Defendants, and each of them, authorized, directed, and/or ratified the wrongful acts alleged herein and, consequently, they are jointly and severally liable to Plaintiff.

11. Plaintiff is further informed and believes, and on that basis alleges, that at all times material hereto, all Defendants acted in concert with one

another to commit the wrongful acts alleged herein, and aided, abetted, incited, compelled, and/or coerced one another in the wrongful acts alleged herein, and/or attempted to do so. Plaintiffs are further informed and believe, and on that basis allege, that Defendants, and each of them, formed and executed a conspiracy and/or a common plan pursuant to which they would commit the unlawful acts alleged herein, with all such acts alleged herein done as part of and pursuant to said conspiracy, intended to cause and causing Plaintiffs harm.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1338(a)(1) because the case concerns a question arising under the laws of the Copyright Act of United States of America (17 U.S.C. § 101, et seq.)

13. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal copyright claim that they form part of the same case or controversy.

14. Alternatively, diversity jurisdiction exists pursuant to pursuant to 28 U.S.C. § 1332(a)(2) because this action is between a Pennsylvania entity domiciled in Pennsylvania and an entity organized under the laws of the State of California and doing business in California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. The Court has general personal jurisdiction over AFIP Defendant, as it maintains offices and regularly conducts business in Beverly Hills, California.

16. This Court has specific personal jurisdiction over AFIP Defendant as it purposefully availed itself of the privilege of conducting business within the Central District of California.

17. Venue is proper in this district pursuant to 28 U.SC. § 1391(b)(1) because, over AFIP Defendant, as it maintains offices and regularly conducts business in Beverly Hills, California, and because a substantial part of the events giving rise to the claims herein occurred in Los Angeles County, California.

**FACTS**

18. Effective on or about October 16, 2023, 76 & Beyond and entered into a Short Term Loan Facility for a Feature Film Entitled "*The Canyon*" ("Picture") attached hereto as Exhibit "A" ("First Canyon Agreement").

19. Paragraphs 1.1 and 4.2 of the First Canyon Agreement provide that 76 & Beyond would loan AFIP $190,000.00 in exchange for, inter alia, (a) repayment of principal, (b) interest payments and (c) payment of an arrangement fee of six percent.

20. On October 17, 2023, 76 & Beyond wired funds to AFIP's designated bank, City National Bank in Sherman Oaks, California.

21. The First Canyon Agreement was in the nature of a bridge loan. Loaned funds were to be repaid no later than four weeks from the wiring of funds. (Paragraph 5.1(a)). Funds were to be repaid earlier upon receipt of funds from any other investor. (Paragraph 5.1(b)).

22. As part of the First Canyon Agreement, AFIP represented and warranted that:

a. It had the full corporate power and authority to give effect to the agreement (Paragraph 8.1(a);

b. It has the full power and capacity to perform its obligations under this Agreement (Paragraph 8.1(b);

c. It had not granted any other security interest in the Collateral and that it must not grant, or permit to be taken, any security interest in the

Collateral except with the prior written consent of AFIP (Paragraph 8.1(c);

23. The First Canyon Agreement defined the "Collateral" as all present and after-acquired rights in *The Canyon* Picture, all proceeds from any producer offset (tax credit), and all worldwide net profit. Paragraph 15.1. Thus, the collateral includes all copyright interests in the film, screenplay, soundtrack, and every other intellectual property interest.

24. Pursuant to the First Canyon Agreement, AFIP granted an immediate security interest in all Collateral to 76 & Beyond. (Paragraph 9.1).

25. Pursuant to the First Canyon Agreement, AFIP agreed that the security interest would have priority over any other security interest in the Collateral. (Paragraph 10).

26. In the event AFIP did not pay the loan under the First Canyon Agreement, AFIP agreed to assign all remaining debt to the AFIP's "next immediate project in the first position." (Paragraph 5.2).

27. AFIP further agreed it would assure that 76 & Beyond and its principals would be provided on screen and other Executive Producer and Co-Producer credits. (Paragraph 11.1).

28. AFIP Defendant was obligated to pay back the loan principal and interest on the First Canyon Agreement on or before November 14, 2023.

29. Effective on or about October 25, 2023, 76 & Beyond and entered into a Short Term Loan Facility for a Feature Film Entitled "*The Canyon*" ("Picture") attached hereto as Exhibit "B" ("Second Canyon Agreement").

/ / /

/ / /

/ / /

30. Paragraphs 1.1 and 4.2 of the Second Canyon Agreement provide that 76 & Beyond would loan AFIP $207,500 in exchange for, inter alia, (a) repayment of principal, (b) interest payments and (c) payment of an arrangement fee.

31. On or about October 25, 2023, 76 & Beyond wired additional funds of $207,500 to AFIP's designated bank, City National Bank in Sherman Oaks, California.

32. The Second Canyon Agreement was in the nature of a bridge loan. Loaned funds were to be repaid no later than four weeks from the wiring of funds. (Paragraph 5.1(a)). Funds were to be repaid earlier upon receipt of funds from any other investor. (Paragraph 5.1(b)).

33. As part of the Second Canyon Agreement, AFIP represented and warranted that:

a. It had the full corporate power and authority to give effect to the agreement (Paragraph 8.1(a);
b. It has the full power and capacity to perform its obligations under this Agreement (Paragraph 8.1(b);
c. It had not granted any other security interest in the Collateral and that it must not grant, or permit to be taken, any security interest in the Collateral except with the prior written consent of AFIP (Paragraph 8.1(c);

34. The Second Canyon Agreement defined the "Collateral" as all present and after-acquired rights in *The Canyon* Picture, all proceeds from any producer offset (tax credit), and all worldwide net profit. Paragraph 15.1. Thus, the collateral includes all copyright interests in the film, screenplay, soundtrack, and every other intellectual property interest.

35. Pursuant to the Second Canyon Agreement, AFIP granted an immediate security interest in all Collateral to 76 & Beyond. (Paragraph 9.1).

36. Pursuant to the Second Canyon Agreement, AFIP agreed that the security interest would have priority over any other security interest in the Collateral. (Paragraph 10).

37. In the event AFIP did not pay the loan under the Second Canyon Agreement, AFIP agreed to assign all remaining debt to the AFIP's "next immediate project in the first position." (Paragraph 5.2).

38. Per the Second Canyon Agreement, AFIP further agreed it would assure that 76 & Beyond and its principals would be provided on screen and other Executive Producer and Co-Producer credits. (Paragraph 11.1).

39. Per the Second Canyon Agreement, AFIP Defendant was obligated to pay back the loan principal and interest on the Second Canyon Agreement on or before November 22, 2023.

40. In both verbal and written communications, 76 & Beyond has demanded performance of the First Canyon Agreement and Second Canyon Agreement.

41. To date, no payment has been made under the First Canyon Agreement or Second Canyon Agreement.

42. On information and belief, AFIP and/or entities or persons acting in concert or conspiracy with it have commenced distributing *The Canyon* and offering copyright licenses and/or assignments, and other rights in or related to *The Canyon*, directly and/or through agents.

43. On information and belief, AFIP and and/or entities or persons acting in concert or conspiracy with it have negotiated agreements which do not protect the credit rights of 76 & Beyond and its principals.

44. Such conduct is part of an established pattern whereby Defendants purport to assign first priority intellectual property rights to third parties, when in fact 76 & Beyond holds first priority.

45. 76 & Beyond has protected its first priority interest arising from the First Canyon Agreement in *The Canyon* by filing UCC Financing Statement U250119238127 on March 14, 2025 (Exhibit "C").

46. 76 & Beyond has protected its first priority interest arising from the Second Canyon Agreement in *The Canyon* by filing UCC Financing Statement U250119275226 on March 14, 2025 (Exhibit "D").

47. 76 & Beyond has protected its first priority interest in *The Canyon* by recording its security interest with the United States Copyright Office.

**FIRST CLAIM FOR RELIEF**

**(Copyright Infringement – Against all Defendants)**

48. 76 & Beyond realleges each foregoing allegation as if set forth herein.

49. 76 & Beyond has been assigned, hypothecated and conveyed all copyright and other interests in *inter alia, The Canyon* motion picture and screenplay. Defendants mortgaged all such rights to 76 & Beyond. 76 & Beyond is the owner of such copyrights and other interests.

50. Defendants have offered to third parties copyright interests in *The Canyon* for sale, and purported to distribute for sale or other transfer of ownership copyright interests in *The Canyon.*

51. On information and belief, Defendants have reproduced copies of *The Canyon* to, inter alia, facilitate unauthorized and unlawful sales and distribution of the Picture.

52. As a direct and proximate result of such infringing activities, 76 & Beyond has sustained and will continue to sustain substantial injury, including the loss or degradation of its security interest and/or the loss or degradation of its credit rights.

53. Plaintiff lacks an adequate remedy at law to address the risks infringement poses to, inter alia, its security interest and credit rights.

/ / /

**SECOND CLAIM FOR RELIEF**

**(Breach of First Canyon Agreement – Against all Defendants)**

54. 76 & Beyond realleges each foregoing allegation as if set forth herein.

55. Defendants have a duty under the First Canyon Agreement to repay principal, pay interest payments, and pay an arrangement fee.

56. Defendants have a duty under the First Canyon Agreement not to pledge or hypothecate any interest in the Collateral to any party other than 76 & Beyond.

57. Defendants have a duty under the First Canyon Agreement to ensure 76 & Beyond and its principals receive proper credit per contractual terms.

58. Defendants have breached their duties by failing to repay principal and pay interest payments and the arrangement fee.

59. Defendants have breached their duty not to pledge, assign, or hypothecate any interest in the Collateral to any party other than 76 & Beyond.

60. Defendants have breached their duty to uphold the First Canyon Agreement credit rights while seeking or obtaining commitments from third parties.

61. Such actions have damaged 76 & Beyond in an amount to be proven at trial.

62. Plaintiff lacks an adequate remedy at law to address the risks such breaches pose to its security interest and credit rights.

**THIRD CLAIM FOR RELIEF**

**(Breach of Second Canyon Agreement – Against all Defendants)**

63. 76 & Beyond realleges each foregoing allegation as if set forth herein.

64. Defendants have a duty under the Second Canyon Agreement to repay principal, pay interest payments, and the arrangement fee.

65. Defendants have a duty under the Second Canyon Agreement not to pledge or hypothecate any interest in the Collateral to any party other than 76 & Beyond.

66. Defendants have a duty under the Second Canyon Agreement to ensure 76 & Beyond and its principals receive proper credit per contractual terms.

67. Defendants have breached their duties by failing to repay principal and pay interest payments and the arrangement fee.

68. Defendants have breached their duty not to pledge, assign, or hypothecate any interest in the Collateral to any party other than 76 & Beyond.

69. Defendants have breached their duty to uphold the Second Canyon Agreement credit rights in seeking or obtaining commitments from third parties.

70. Such actions have damaged 76 & Beyond in an amount to be proven at trial.

71. Plaintiff lacks an adequate remedy at law to address the risks such breaches pose to its security interest and credit rights.

**FOURTH CAUSE OF ACTION**

**(Declaratory Relief against All Defendants)**

72. Plaintiff re-alleges and re-incorporates herein each prior allegation.

73. Defendants have made false representations to third parties regarding their ownership of the Collateral and rights to transfer, convey or hypothecate the Collateral.

74. Defendants have disputed 76 & Beyond's ownership of the Collateral.

75. Accordingly, there is a bona fide, actual, present, practical need for the declaration sought.

76. Defendants' false representations are affecting Plaintiff's security interest.

77. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning whether Defendants are permitted to reproduce or distribute the Picture, Collateral, and intellectual property rights.

78. Accordingly, Plaintiff seeks a declaration that Defendants may not reproduce, distribute, or otherwise purport to transfer, convey, or hypothecate the Collateral or any part thereof, or assert any ownership interest in the Collateral.

79. A judicial declaration at this time is necessary so that Defendants will not continue in their infringement, attempted infringement, and attempted license or hypothecation of the Collateral. Should no declaration issue, Plaintiff will lose its security interest in the Collateral or see such interest materially prejudiced.

**FIFTH CAUSE OF ACTION**

(Injunctive Relief Against all Defendants)

80. 76 & Beyond re-alleges and re-incorporates herein each prior allegation.

81. 76 & Beyond has suffered irreparable injury to its security interest in the Collateral as a result of Defendant's reproduction and distribution of copyrights in the motion picture, screenplay, and soundtrack, and misrepresentation of the nature and extent of Defendants' rights to the Collateral in their statements to third parties.

82. There is no adequate remedy at law for such injuries.

83. The balance of hardships weighs in favor of enjoining against further injuries.

84. The public interest in, inter alia, establishing clear rights to title and interest in the Collateral, and in upholding the Copyright Act would be served by granting 76 & Beyond injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. Actual damages in an amount to be proven at trial;
2. Defendant's profits;
3. An accounting;
4. Attorney's fees;
5. Costs;
6. Pre-judgment interest;
7. Preliminary and permanent injunctive relief enjoining Defendants and those acting in concert or conspiracy with them from engaging in further acts of copyright infringement; and
8. Such other relief as the Court deems necessary and proper.

Dated: September 17, 2026 LAW OFFICE OF JUSTIN SOBODASH, P.C.

By: **/s/ Justin Sobodash**

Justin Sobodash, Esq.
8335 West Sunset Boulevard, Suite 366
West Hollywood, California 90069
Telephone: (310) 729-2184
justin@sobodashlaw.com
Attorney for Plaintiff 76 & Beyond, LLC

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action so triable.

Dated: September 17, 2026

LAW OFFICE OF JUSTIN SOBODASH, P.C.

By: **/s/ Justin Sobodash**

Justin Sobodash, Esq.
8335 West Sunset Boulevard, Suite 366
West Hollywood, California 90069
Telephone: (310) 729-2184
justin@sobodashlaw.com
Attorney for Plaintiff 76 & Beyond, LLC

# Exhibit "A"

**October 16, 2023**

**Arclight Films**

**Re: Short term loan facility for a feature film entitled *"THE CANYON"* (Picture)**

Dear Sirs,

**76 and Beyond, LLC** (the **Lender**) is pleased to offer **Arclight Films International Pty, LLC** (the **Borrower**) a loan facility to assist with payment of up to One Hundred and Ninety Thousand United States Dollars ($190,000.00 USD) for production costs in connection with the production of the Picture currently known as THE CANYON (**Business Purpose**) on and subject to the terms set out in this Agreement.

If you wish to accept the Lender's offer of a loan facility, please sign and return the enclosed copy of this agreement (**Agreement**) to me as soon as possible.

## 1 THE LOAN FACILITY

1.1 On or before October 16, 2023, the Lender has or will provide the financial accommodation requested by the Borrower under this Agreement for the total amount up to One Hundred and Ninety Thousand United States Dollars ($190,000.00 USD) for a minimum of four weeks going to Borrower (**Loan Facility**).

**Arrangement Fee:** A fixed arrangement fee of Fifteen Thousand United States Dollars ($15,000.00 USD) or Six Percent (6%) of the gross amount of the Facility, whichever is greater, will be payable by Borrower to DJ Dodd and Paolo Pilladi (collectively "DP") or their respective loan-out companies within forty-eight hours after receiving Loan Facility.

1.2 The Loan Facility is the principal amount to be advanced by the Lender to the Borrower and each instalment of the Loan Facility is an advance (**Advance**). For the avoidance of doubt, the full amount of One Hundred and Ninety Thousand United States Dollars ($190,000.00 USD) can be paid in multiple tranches.

1.3 The Lender shall not be obliged to pay any part of the Advance to the Borrower until the Borrower has obtained the approval of the Lender to/supplied copies or originals, if applicable, of all the following in form and in content satisfactory to the Lender:

(a) final main production budget and final main production cashflow schedule for the Picture, approved by the Lender and the proposed completion guarantor; and
(b) draft of pre-sales agreements; and
(c) clear chain of title; and
(d) confirmation of lead cast's unconditional commitment to star in the Picture; and
(e) the identities of the individual producers and line producer of the Picture (and their approval by the financiers and the proposed completion guarantor) and evidence of their unconditional commitment to render services on the Picture on the dates required; and
(f) The board resolutions of the Borrower approving and authorising the execution by of the Borrower of this Agreement;
(g) the identity of the proposed completion guarantor of the Picture and a signed letter of intent/draft completion guarantee containing, without limitation, the budget figure for the production financing of the Picture in an amount equal to that

approved hereunder by the Lender, and approval of the proposed completion guarantor of the full production budget;

(h) the identity of the senior lender with proof of engagement between senior lender and Borrower; and

(i) such other documents as may be required from the Borrower by the Lender; and

(j) any/all final copies of fully executed relevant agreements once available, including but not limited to Amazon MG, actor contracts, completion bond, and senior loan

## 2 PURPOSE OF THE FACILITY

2.1 The Borrower and Lender agree that the Loan Facility will be provided to the Borrower solely for the Business Purpose.

## 3 PAYMENT OF ADVANCES

3.1 Subject to the terms of this Agreement, the Lender will:

(a) subject to clause 1.3, advance the Advance/s on the dates and in the amounts set out in clause 1.2 above;

(b) pay the Advances into the following bank account which has been established solely for the production of the Picture:

| **Arclight Films International Pty, LLC** | |
|---|---|
| Account Name | Arclight Films International Pty, LLC |
| Account Number | 413334179 |
| CNB Routing Number | 122016066 |
| Bank Name | City National Bank |
| Bank Branch Address | 15260 Ventura Blvd, Sherman Oaks, Ca. 91404 |
| Bank Telephone Number | (818) 773-4442 |
| Account Manager | Edward Stoll |
| Swift Code | CINAUS6L |

## 4 INTEREST & FEES

4.1 The Borrower must pay Interest charged by the Lender in accordance with this clause 4.

4.2 Interest will be charged on each Advance applicable to the relevant tranche and will:

(a) be calculated on actual days elapsed, based on a 7-day week and on a year of 365 days, until the Loan Amount, Interest and Expenses are repaid in full; and

(b) be calculated starting on written confirmation from bank of initial transfer by Lender and ending on written confirmation from bank on final transfer by Borrower, and

(c) be charged at the rate of Two Percent (2) per week for the first Two weeks and increasing to Two and a half Percent (2.5%) after 2 weeks and increasing to Three Percent (3%) per week after five weeks (**Interest Rate**); and

(d) a four-week (4) interest minimum of Nine Percent (9%) even if repayment happens before 4 weeks; and

(e) should only partial repayment be provided to Lender by four weeks, interest will continue at the rates listed in 4.2(c) for the remaining amounts owed; and

(f) be paid by the Borrower to the Lender on the repayment of the Loan Facility on the Repayment Date.

## 5 REPAYMENT

5.1 The Borrower must promptly repay the Loan Facility, Interest and Expense to the Lender in the currency in which it was lent upon the earlier of:

(a) Four weeks from the date of the initial transfer of the Advance from Lender (the "**Repayment Date**"); or

(b) the first date on which sufficient funds from any Investor or Debt Financier for the Picture are available to the Borrower to fund the cost of production of the Picture ("Third Party Funds") to enable the Borrower to repay the Loan Facility, Expense and Interest in full provided that the Borrower undertakes that it shall not use any Third Party Funds for any purpose other than repayment of the Secured Indebtedness until it has been paid in full.

5.2 Should the Borrower not repay the Loan Facility, Interest, and Expenses within 12 weeks of the initial transfer by Lender, Borrower agrees to assign all remaining debt from Loan Facility, Interest, and Expenses to Borrower's next immediate project as collateralized debt in first position.

5.3 The Borrower must repay the Loan Facility, Interest and Expenses directly into the following account:

Account Name: 76 & Beyond LLC
Bank: TD Bank
Routing number: 036001808
Account Number: 4391723040

## 6 EXTENSION OF THE LOAN FACILITY

6.1 The Borrower may request that the Lender extend the Repayment Date for the Loan Facility:

(a) at any time not less than 10 days before a scheduled or agreed Repayment Date for a tranche; and
(b) by notice in writing.

6.2 The Lender may in its absolute discretion reject or accept a request made pursuant to clause 6.1.

6.3 If the Lender agrees to the request of the Borrower to extend the Repayment Date, then the Lender may apply such conditions to any extension as it considers appropriate, including without limitation, the payment of an additional fee and changes to the Interest Rate applying to the Loan Facility or any part of it.

## 7 OBLIGATIONS OF THE BORROWER

7.1 At the request of the Lender, the Borrower will:

(a) provide the Lender with all Reports at the same time as those reports are provided to any Investor or Debt Financier in the Picture, as applicable;
(b) supply to the Lender a true copy of any Transaction Document;
(c) if any application is made to the Film Authority, supply the Lender with a true and complete copy of the information supplied to the Film Authority in its application for either a Provisional Certificate or a Final Certificate for the Picture;
(d) such other documents or information as may be reasonably required by the Lender.

## 8 WARRANTIES

8.1 The Borrower represents and warrants to the Lender on a continuing basis each of the following:

(a) it has full corporate power to enter into and give effect to this Agreement; and
(b) it has the ability and capacity to perform its obligations under this Agreement.
(c) it has not granted any other Security Interest in the Collateral, other than those referred to in this Agreement, and must not grant, or permit to be taken, any Security Interest in the Collateral except with the prior written consent of the Lender; and
(d) it shall not enter into any agreement with any other company or entity to provide production services on the Picture which would entitle such company or entity to apply for the Producer Offset; and
(e) it has disclosed in writing to the Lender all facts and information relating to it, the Transaction Documents and all things in connection with them which are material to the assessment of the nature and amount of the risk undertaken by the Lender in entering into this Agreement, and the Borrower will immediately notify the Lender in the event any of the facts, information, or circumstances relating to it or the Transaction Documents changes; and
(f) all material statements in this Agreement or in any documents or information supplied to the Lender by or on behalf of the Borrower including the Transaction Documents, and any other documents or information in connection with the Picture, whether as to matters of fact or law, are true, complete and accurate in all respects and are not misleading, and the Borrower will immediately notify the Lender in the event any of the statements, information, or circumstances relating to it or the Transaction Documents changes; and
(g) it will comply with the COVID-19 Plan if required, and if there is or likely to be any delay to or other impact on the Picture arising from or related to COVID-19, it will notify the Lender in writing and provide such details or information as the Lender may reasonably require.

8.2 The Lender represents and warrants to the Borrower that:

(a) The Lender has the capacity to enter into, execute and deliver this Agreement and no further action will be or is necessary on the part of the Lender to make this Agreement legal, valid, binding and enforceable on the Lender in accordance with the terms of this Agreement;
(b) this Agreement is legal, valid and binding on the Lender and enforceable in accordance with the terms hereof; and
(c) the Lender is not subject to any contract, order, judgment or decree that will (whether owing to the giving of notice, lapse of time, or both) prohibit or prevent the completion of the transactions contemplated by this Agreement or the performance of its obligations under this Agreement.

## 9 GRANT OF SECURITY

9.1 To secure payment of the Secured Indebtedness by the Borrower and the performance of all other obligations of the Borrower under this Agreement, the Borrower grants the Lender a Security Interest over the Collateral, such Security Interest to attach immediately.

9.2 To the extent that the Security Interest relates to after-acquired Collateral, the Security Interest attaches on the date that the Borrower has the power to transfer rights in such Collateral to the Lender.

9.3 The Borrower must, at its own expense, whenever requested by the Lender, promptly do or cause to be done anything that the Lender considers reasonably necessary or desirable to perfect and protect any Security Interest in the Collateral created under this Agreement.

9.4 The Borrower:

(a) must not, without the prior consent of the Lender, sell, assign, or otherwise dispose of the Collateral; and
(b) must provide details of any Collateral necessary for the Lender to register and maintain an effective financing statement in respect of the Security Interest.

9.5 Immediately on confirmation of the full and indefeasible repayment of the Loan Amount, Interest and Expenses by the Lender, the Lender's Security Interest is automatically released.

## 10 PRIORITY OF SECURITY INTERESTS

The Security Interest created by this Agreement will rank in priority to any other Security Interest granted over the Collateral.

## 11 CREDITS

11.1 Borrower will provide Lender the following Executive Producer / Co-Producer / Company Credits: Perry Doc Alleva (EP), Michael O'Laughlin (EP), DJ Dodd (Co-Producer), Paolo Pilladi (Co-Producer) ("Credits"). 76 & Beyond – Financing Provided By with the credit for 76 & Beyond to be displayed on IMDB.

(a) On Screen: Borrower agrees Credits will be included on all positive prints of the Film, in the main titles, grouped with all other "Executive Producer/Co-Producer" credits, on shared card with only each other (i.e. 2 EPs together and 2 Co-producers together, each on single card), in a size of type no less favourable than 100% of the size of type used in connection with any other "Executive Producer" credit.
(b) Borrower agrees Credits will be featured in all paid advertising for the film, digital and/or print, including poster billing block, trailer billing block, and DVD/Blu-Ray cover billing block.
(c) Borrower agrees Credits will be included in all press releases.

11.2 No casual or inadvertent failure by the Borrower or its distributors, licensees, agents or assigns to comply with the provisions of this clause shall constitute a breach of this Agreement provided that the Borrower shall ensure that it notifies in writing third party distributors, licensees, agents or assigns of with its obligations for the Lender's credits. Should the Borrower receive notice from the Lender that there is a breach of this clause then the Borrower shall, within a reasonable time after receiving such notice, attempt to

remedy the breach if it is capable of being remedied on a prospective basis (without the obligation to recall any works already created or published).

## 12 ENTITLEMENTS

12.1 The Borrower shall provide to the Lender eight (8) tickets to the first "celebrity" premiere of the Film.

12.2 The Lender and its designees shall be permitted to visit the set of Picture at times to be agreed between the parties in good faith.

## 13 TERMINATION

13.1 The Lender will, without prejudice to any of the Lender's other rights and remedies at law or in equity or otherwise, be entitled by notice in writing to the Borrower to terminate this Agreement if any of the following events occur:

(a) the Borrower is in breach of any term of this Agreement (**Default**) for a period of seven (7) days following written notice from the Lender to remedy the Default; or
(b) the Borrower is unable to pay the Borrower's debts as and when they fall due, or is deemed unable to pay the Borrower's debts according to any applicable legislation (other than because of a failure to pay a debt or claim that is the subject of a good faith dispute); or
(c) the Borrower enters or resolves to enter any arrangement, composition, or compromise with or assignment for the benefit of the Borrower's creditors generally or any class of the Borrower's creditors, or the commencement of proceedings to sanction any such arrangement, composition, or compromise; or
(d) an application (other than a frivolous or vexatious application) or an order is made for the winding up or dissolution of the Borrower or a resolution is passed for the winding up or dissolution of the Borrower; or
(e) the appointment of a receiver or receiver and manager, controller, administrator, trustee, or similar officer over all or any part of the assets or undertaking of the Borrower or any subsidiary or holding company.

13.2 If the Lender terminates this Agreement, the Borrower must immediately pay the Secured Indebtedness to the Lender.

13.3 Upon termination of this Agreement, the Lender will remain entitled to enforce any claim against the Borrower arising from any breach of this Agreement that may have occurred before termination.

## 14 Further Assurance

14.1 The Borrower must at its own expense promptly execute all documents and do or use reasonable endeavours to cause a third party to do all things that another party from time to time may reasonably request in order to give effect to, perfect or complete this Agreement and all transactions incidental to it.

**Relationship**

14.2 Nothing contained or implied in this Agreement makes a party the partner, agent or legal representative of another party for any purpose or creates any partnership, agency or trust,

and no party has any authority to bind another party in any way, other than as set out in this Agreement.

**Whole Agreement**

14.3 This Agreement contains everything the parties have agreed in relation to the subject matter it deals with. No party can rely on an earlier written document, or anything said or done by or on behalf of another party before this Agreement was executed.

14.4 This Agreement may not be altered or modified other than by a subsequent written instrument executed by the parties.

**Expenses**

14.5 The Borrower shall pay the Lender all mutually agreed upon Expenses incurred by the Lender upon demand.

**Assignment**

14.6 The parties shall not assign, transfer, mortgage, charge, subcontract, declare a trust over or deal in any other manner with any of its rights and obligations under this Agreement without the prior written consent of the other party. Such consent not to be unreasonably withheld or delayed.

**Waiver**

14.7 No failure or delay by a party to exercise any right or remedy provided under this Agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

**Severance**

14.8 If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Agreement.

**Third Party Rights**

14.9 No one other than a party to this Agreement, their successors and permitted assignees, shall have any right to enforce any of its terms.

**Counterparts**

14.10 This Agreement may be executed in any number of counterparts, each of which shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

**Governing Law and Jurisdiction**

14.11 This Agreement is governed by the law of the Commonwealth of Pennsylvania. Each party irrevocably agrees that the courts of the Commonwealth of Pennsylvania shall have non-exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims).

## 15 DEFINITIONS AND INTERPRETATION

**Definitions**

15.1 In this Agreement, unless the context clearly indicates otherwise:

**Collateral** includes each of the following:

(a) all the Borrower's present and after-acquired rights, assets and undertakings, including in the Picture, and including all Circulating and Non-Circulating Assets and
(b) if the Picture is made as a Qualifying Film, 100% of the Borrower's entitlement to the proceeds of any Producer Offset; and
(c) any and all entitlement of the Borrower to worldwide net profit (as defined in the principal investment agreement for the Picture) from the exploitation of the Picture.

**COVID-19** means the pandemic disease known as COVID-19 and any other disease or illness caused, contributed to, or affected by the virus SARS-CoV-2 (or any mutation).

**COVID-19 Plan** means a detailed plan setting out any potential delays or other impacts caused to the production and delivery of the Picture from COVID-19 and for responding to the potential delays or other impacts, including any mitigation plan.

**Debt Financier** means any bank, financial institution or third-party lender that provides a loan facility to fund the negative cost of the Picture.

**Expenses** means any all costs, charges, duties, fees and expenses owed to or incurred directly or indirectly by the Lender in accordance with this Agreement, including in accordance with clause 4.3, or otherwise in connection with the Borrower's indebtedness to the Lender or in relation to the enforcement of this Agreement, or in relation to any such indebtedness or liabilities on a full indemnity basis.

**Finance Plan** means the finance plan for the Picture attached as Schedule 2.

**Financier/s** means any investor, funder, screen agency or financier, including any gap financiers, that provides funding to pay for the development or the negative cost of the Picture.
**Interest** means interest payable on the Loan Facility calculated in accordance with clause 4.
**Investor** means any investor, funder, screen agency or financier that provides funding to pay for the development or the negative cost of the Picture.

**Producer Offset** means any payable cash element constituting a refundable tax credit.

**Reports** means all customary reports, including production and costs reports, required to be provided by the Borrower pursuant to any financing agreement, any production and investment agreement or any debt funding arrangement.

**Secured Indebtedness** means all monies that the Borrower is currently or in the future

liable or contingently liable to pay to the Lender under this Agreement, including without limitation: the Loan Amount, Interest and Expenses.

**Security Interest** includes any:

(a) mortgage, pledge, lien, charge, encumbrance, option or third-party security;
(b) contractual, proprietary, or preferential interest or arrangement of any kind;
(c) right of or arrangement with any creditor to have its claims satisfied before other creditors from any asset; and

**Transaction Document** means the documents specified as transaction documents or documents that are conditions precedent in any:

(a) loan and security agreement entered into by the Borrower and a Debt Financier; and
(b) financing agreement entered into by the Borrower and a Financier.

**Interpretation**

15.2 In the interpretation of this Agreement, the following provisions apply unless the context otherwise requires:

(a) If the day on which any act, matter or thing is to be done under this Agreement is not a business day, the act, matter, or thing must be done on the next business day.
(b) A reference in this Agreement to 'dollars' or '$' means U.S dollars and all amounts payable under this Agreement are payable in U.S dollars.
(c) A reference in this Agreement to any law, legislation or legislative provision includes any statutory modification, amendment or re-enactment, and any subordinate legislation or regulations issued under that legislation or legislative provision.
(d) A reference in this Agreement to any document or agreement is to that document or agreement as amended, novated, supplemented or replaced.
(e) An expression importing a natural person includes any company, trust, partnership, joint venture, association, body corporate or governmental agency.
(f) A word which indicates the singular also indicates the plural, a word which indicates the plural also indicates the singular, and a reference to any gender also indicates the other gender.
(g) The meaning of general words is not limited by specific examples introduced by "including", "for example" or similar expressions.

**EXECUTED** as an agreement on ......10-17-2023...... 2023

**EXECUTED AS AN AGREEMENT** by 76 & Beyond, LLC **in** the presence of:

......[signature]......
Signature of Authorized Signatory

......Perry C. Alleva......
Name of Authorized Signatory (Please Print)

**EXECUTED AS AN AGREEMENT** by **Arclight Films International Pty, LLC**
in the presence of:

..............................................................................
Signature of Authorized Signatory

GARY HAMILTON
..............................................................................
Name of Authorized Signatory (Please Print)

# Exhibit "B"

**October 25, 2023**

**Arclight Films**

**Re: Short term loan facility for a feature film entitled "*THE CANYON*" (Picture)**

Dear Sirs,

**76 and Beyond, LLC** (the **Lender**) is pleased to offer **Arclight Films International Pty, LLC** (the **Borrower**) a loan facility to assist with payment of up to Two Hundred Seven Thousand Five Hundred United States Dollars ($207,500.00 USD) for production costs in connection with the production of the Picture currently known as THE CANYON (**Business Purpose**) on and subject to the terms set out in this Agreement.

If you wish to accept the Lender's offer of a loan facility, please sign and return the enclosed copy of this agreement (**Agreement**) to me as soon as possible.

## 1 THE LOAN FACILITY

1.1 On or before October 27, 2023, the Lender has or will provide the financial accommodation requested by the Borrower under this Agreement for the total amount up to Two Hundred Seven Thousand Five Hundred United States Dollars ($207,500.00 USD) for a minimum of three weeks going to Borrower (**Loan Facility**).

**Arrangement Fee:** A fixed arrangement fee of Seven Thousand Five Hundred United States Dollars ($7,500.00 USD) will be payable by Borrower to DJ Dodd and Paolo Pilladi (collectively "DP") or their respective loan-out companies within forty-eight hours after receiving Loan Facility.

1.2 The Loan Facility is the principal amount to be advanced by the Lender to the Borrower and each instalment of the Loan Facility is an advance (**Advance**).

1.3 The Lender shall not be obliged to pay any part of the Advance to the Borrower until the Borrower has obtained the approval of the Lender to/supplied copies or originals, if applicable, of all the following in form and in content satisfactory to the Lender:

- (a) final main production budget and final main production cashflow schedule for the Picture, approved by the Lender and the proposed completion guarantor; and
- (b) draft of pre-sales agreements; and
- (c) clear chain of title; and
- (d) confirmation of lead cast's unconditional commitment to star in the Picture; and
- (e) the identities of the individual producers and line producer of the Picture (and their approval by the financiers and the proposed completion guarantor) and evidence of their unconditional commitment to render services on the Picture on the dates required; and
- (f) The board resolutions of the Borrower approving and authorising the execution by of the Borrower of this Agreement;
- (g) the identity of the proposed completion guarantor of the Picture and a signed letter of intent/draft completion guarantee containing, without limitation, the budget figure for the production financing of the Picture in an amount equal to that approved hereunder by the Lender, and approval of the proposed completion guarantor of the full production budget;

(h) the identity of the senior lender with proof of engagement between senior lender and Borrower; and
(i) such other documents as may be required from the Borrower by the Lender; and
(j) any/all final copies of fully executed relevant agreements once available, including but not limited to Amazon MG, actor contracts, completion bond, and senior loan

---

**2 PURPOSE OF THE FACILITY**

2.1 The Borrower and Lender agree that the Loan Facility will be provided to the Borrower solely for the Business Purpose.

---

**3 PAYMENT OF ADVANCES**

3.1 Subject to the terms of this Agreement, the Lender will:

(a) subject to clause 1.3, advance the Advance/s on the dates and in the amounts set out in clause 1.2 above;
(b) pay the Advances into the following bank account which has been established solely for the production of the Picture:

Account Name:
Bank:
Sort Code:
Swift:
IBAN:
Account Number:
Address:

---

**4 INTEREST & FEES**

4.1 The Borrower must pay Interest charged by the Lender in accordance with this clause 4.

4.2 Interest will be charged on each Advance applicable to the relevant tranche and will:

(a) be calculated on actual days elapsed, based on a 7-day week and on a year of 365 days, until the Loan Amount, Interest and Expenses are repaid in full; and
(b) be calculated starting on written confirmation from bank of initial transfer by Lender and ending on written confirmation from bank on final transfer by Borrower, and
(c) be charged at the rate of Two Percent (2%) per week for the first two weeks and increasing to Two and a Half Percent (2.5%) per week for weeks 3 and 4 and increasing to Three Percent (3%) per week after four weeks (**Interest Rate**); and
(d) a three-week (3) interest minimum of Six and One Half Percent (6.5%) even if repayment happens before 3 weeks; and
(e) should only partial repayment be provided to Lender by three weeks, interest will continue at the rates listed in 4.2(c) for the remaining amounts owed; and
(f) be paid by the Borrower to the Lender on the repayment of the Loan Facility on the Repayment Date.

## 5 REPAYMENT

5.1 The Borrower must promptly repay the Loan Facility, Interest and Expense to the Lender in the currency in which it was lent upon the earlier of:

(a) Four weeks from the date of the initial transfer of the Advance from Lender (the "**Repayment Date**"); or

(b) the first date on which sufficient funds from any Investor or Debt Financier for the Picture are available to the Borrower to fund the cost of production of the Picture ("Third Party Funds") to enable the Borrower to repay the Loan Facility, Expense and Interest in full provided that the Borrower undertakes that it shall not use any Third Party Funds for any purpose other than repayment of the Secured Indebtedness until it has been paid in full.

5.2 Should the Borrower not repay the Loan Facility, Interest, and Expenses within 12 weeks of the initial transfer by Lender, Borrower agrees to assign all remaining debt from Loan Facility, Interest, and Expenses to Borrower's next immediate project as collateralized debt in first position.

5.3 The Borrower must repay the Loan Facility, Interest and Expenses directly into the following account:

Account Name: 76 & Beyond LLC
Bank: TD Bank
Routing number: 036001808
Account Number: 4391723040

## 6 EXTENSION OF THE LOAN FACILITY

6.1 The Borrower may request that the Lender extend the Repayment Date for the Loan Facility:

(a) at any time not less than 10 days before a scheduled or agreed Repayment Date for a tranche; and
(b) by notice in writing.

6.2 The Lender may in its absolute discretion reject or accept a request made pursuant to clause 6.1.

6.3 If the Lender agrees to the request of the Borrower to extend the Repayment Date, then the Lender may apply such conditions to any extension as it considers appropriate, including without limitation, the payment of an additional fee and changes to the Interest Rate applying to the Loan Facility or any part of it.

## 7 OBLIGATIONS OF THE BORROWER

7.1 At the request of the Lender, the Borrower will:

(a) provide the Lender with all Reports at the same time as those reports are provided to any Investor or Debt Financier in the Picture, as applicable;
(b) supply to the Lender a true copy of any Transaction Document;

(c) if any application is made to the Film Authority, supply the Lender with a true and complete copy of the information supplied to the Film Authority in its application for either a Provisional Certificate or a Final Certificate for the Picture;

(d) such other documents or information as may be reasonably required by the Lender.

## 8 WARRANTIES

8.1 The Borrower represents and warrants to the Lender on a continuing basis each of the following:

(a) it has full corporate power to enter into and give effect to this Agreement; and

(b) it has the ability and capacity to perform its obligations under this Agreement.

(c) it has not granted any other Security Interest in the Collateral, other than those referred to in this Agreement, and must not grant, or permit to be taken, any Security Interest in the Collateral except with the prior written consent of the Lender; and

(d) it shall not enter into any agreement with any other company or entity to provide production services on the Picture which would entitle such company or entity to apply for the Producer Offset; and

(e) it has disclosed in writing to the Lender all facts and information relating to it, the Transaction Documents and all things in connection with them which are material to the assessment of the nature and amount of the risk undertaken by the Lender in entering into this Agreement, and the Borrower will immediately notify the Lender in the event any of the facts, information, or circumstances relating to it or the Transaction Documents changes; and

(f) all material statements in this Agreement or in any documents or information supplied to the Lender by or on behalf of the Borrower including the Transaction Documents, and any other documents or information in connection with the Picture, whether as to matters of fact or law, are true, complete and accurate in all respects and are not misleading, and the Borrower will immediately notify the Lender in the event any of the statements, information, or circumstances relating to it or the Transaction Documents changes; and

(g) it will comply with the COVID-19 Plan if required, and if there is or likely to be any delay to or other impact on the Picture arising from or related to COVID-19, it will notify the Lender in writing and provide such details or information as the Lender may reasonably require.

8.2 The Lender represents and warrants to the Borrower that:

(a) The Lender has the capacity to enter into, execute and deliver this Agreement and no further action will be or is necessary on the part of the Lender to make this Agreement legal, valid, binding and enforceable on the Lender in accordance with the terms of this Agreement;

(b) this Agreement is legal, valid and binding on the Lender and enforceable in accordance with the terms hereof; and

(c) the Lender is not subject to any contract, order, judgment or decree that will (whether owing to the giving of notice, lapse of time, or both) prohibit or prevent the completion of the transactions contemplated by this Agreement or the performance of its obligations under this Agreement.

## 9 GRANT OF SECURITY

9.1 To secure payment of the Secured Indebtedness by the Borrower and the performance of all other obligations of the Borrower under this Agreement, the Borrower grants the Lender a Security Interest over the Collateral, such Security Interest to attach immediately.

9.2 To the extent that the Security Interest relates to after-acquired Collateral, the Security Interest attaches on the date that the Borrower has the power to transfer rights in such Collateral to the Lender.

9.3 The Borrower must, at its own expense, whenever requested by the Lender, promptly do or cause to be done anything that the Lender considers reasonably necessary or desirable to perfect and protect any Security Interest in the Collateral created under this Agreement.

9.4 The Borrower:

(a) must not, without the prior consent of the Lender, sell, assign, or otherwise dispose of the Collateral; and
(b) must provide details of any Collateral necessary for the Lender to register and maintain an effective financing statement in respect of the Security Interest.

9.5 Immediately on confirmation of the full and indefeasible repayment of the Loan Amount, Interest and Expenses by the Lender, the Lender's Security Interest is automatically released.

## 10 PRIORITY OF SECURITY INTERESTS

The Security Interest created by this Agreement will rank in priority to any other Security Interest granted over the Collateral.

## 11 CREDITS

11.1 Borrower will provide Lender the following Executive Producer / Co-Producer / Company Credits: Perry Doc Alleva (EP), Michael O'Laughlin (EP), DJ Dodd (Co-Producer), Paolo Pilladi (Co-Producer) ("Credits"). 76 & Beyond – Financing Provided By with the credit for 76 & Beyond to be displayed on IMDB..

(a) On Screen: Borrower agrees Credits will be included on all positive prints of the Film, in the main titles, grouped with all other "Executive Producer/Co-Producer" credits, on shared card with only each other (i.e. 2 EPs together and 2 Co-producers together, each on single card), in a size of type no less favourable than 100% of the size of type used in connection with any other "Executive Producer" credit.
(b) Borrower agrees Credits will be featured in all paid advertising for the film, digital and/or print, including poster billing block, trailer billing block, and DVD/Blu-Ray cover billing block.
(c) Borrower agrees Credits will be included in all press releases.

11.2 No casual or inadvertent failure by the Borrower or its distributors, licensees, agents or assigns to comply with the provisions of this clause shall constitute a breach of this Agreement provided that the Borrower shall ensure that it notifies in writing third party distributors, licensees, agents or assigns of with its obligations for the Lender's credits. Should the Borrower receive notice from the Lender that there is a breach of this clause then the Borrower shall, within a reasonable time after receiving such notice, attempt to

remedy the breach if it is capable of being remedied on a prospective basis (without the obligation to recall any works already created or published).

## 12 ENTITLEMENTS

12.1 The Borrower shall provide to the Lender eight (8) tickets to the first "celebrity" premiere of the Film.

12.2 The Lender and its designees shall be permitted to visit the set of Picture at times to be agreed between the parties in good faith.

## 13 TERMINATION

13.1 The Lender will, without prejudice to any of the Lender's other rights and remedies at law or in equity or otherwise, be entitled by notice in writing to the Borrower to terminate this Agreement if any of the following events occur:

(a) the Borrower is in breach of any term of this Agreement (**Default**) for a period of seven (7) days following written notice from the Lender to remedy the Default; or
(b) the Borrower is unable to pay the Borrower's debts as and when they fall due, or is deemed unable to pay the Borrower's debts according to any applicable legislation (other than because of a failure to pay a debt or claim that is the subject of a good faith dispute); or
(c) the Borrower enters or resolves to enter any arrangement, composition, or compromise with or assignment for the benefit of the Borrower's creditors generally or any class of the Borrower's creditors, or the commencement of proceedings to sanction any such arrangement, composition, or compromise; or
(d) an application (other than a frivolous or vexatious application) or an order is made for the winding up or dissolution of the Borrower or a resolution is passed for the winding up or dissolution of the Borrower; or
(e) the appointment of a receiver or receiver and manager, controller, administrator, trustee, or similar officer over all or any part of the assets or undertaking of the Borrower or any subsidiary or holding company.

13.2 If the Lender terminates this Agreement, the Borrower must immediately pay the Secured Indebtedness to the Lender.

13.3 Upon termination of this Agreement, the Lender will remain entitled to enforce any claim against the Borrower arising from any breach of this Agreement that may have occurred before termination.

## 14 Further Assurance

14.1 The Borrower must at its own expense promptly execute all documents and do or use reasonable endeavours to cause a third party to do all things that another party from time to time may reasonably request in order to give effect to, perfect or complete this Agreement and all transactions incidental to it.

**Relationship**

14.2 Nothing contained or implied in this Agreement makes a party the partner, agent or legal representative of another party for any purpose or creates any partnership, agency or trust,

and no party has any authority to bind another party in any way, other than as set out in this Agreement.

**Whole Agreement**

14.3 This Agreement contains everything the parties have agreed in relation to the subject matter it deals with. No party can rely on an earlier written document, or anything said or done by or on behalf of another party before this Agreement was executed.

14.4 This Agreement may not be altered or modified other than by a subsequent written instrument executed by the parties.

**Expenses**

14.5 The Borrower shall pay the Lender all mutually agreed upon Expenses incurred by the Lender upon demand.

**Assignment**

14.6 The parties shall not assign, transfer, mortgage, charge, subcontract, declare a trust over or deal in any other manner with any of its rights and obligations under this Agreement without the prior written consent of the other party. Such consent not to be unreasonably withheld or delayed.

**Waiver**

14.7 No failure or delay by a party to exercise any right or remedy provided under this Agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

**Severance**

14.8 If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Agreement.

**Third Party Rights**

14.9 No one other than a party to this Agreement, their successors and permitted assignees, shall have any right to enforce any of its terms.

**Counterparts**

14.10 This Agreement may be executed in any number of counterparts, each of which shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

**Governing Law and Jurisdiction**

14.11 This Agreement is governed by the law of the Commonwealth of Pennsylvania. Each party irrevocably agrees that the courts of the Commonwealth of Pennsylvania shall have non-exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims).

## 15 DEFINITIONS AND INTERPRETATION

**Definitions**

15.1 In this Agreement, unless the context clearly indicates otherwise:

**Collateral** includes each of the following:

(a) all the Borrower's present and after-acquired rights, assets and undertakings, including in the Picture, and including all Circulating and Non-Circulating Assets and
(b) if the Picture is made as a Qualifying Film, 100% of the Borrower's entitlement to the proceeds of any Producer Offset; and
**(c)** any and all entitlement of the Borrower to worldwide net profit (as defined in the principal investment agreement for the Picture) from the exploitation of the Picture.

**COVID-19** means the pandemic disease known as COVID-19 and any other disease or illness caused, contributed to, or affected by the virus SARS-CoV-2 (or any mutation).

**COVID-19 Plan** means a detailed plan setting out any potential delays or other impacts caused to the production and delivery of the Picture from COVID-19 and for responding to the potential delays or other impacts, including any mitigation plan.

**Debt Financier** means any bank, financial institution or third-party lender that provides a loan facility to fund the negative cost of the Picture.

**Expenses** means any all costs, charges, duties, fees and expenses owed to or incurred directly or indirectly by the Lender in accordance with this Agreement, including in accordance with clause 4.3, or otherwise in connection with the Borrower's indebtedness to the Lender or in relation to the enforcement of this Agreement, or in relation to any such indebtedness or liabilities on a full indemnity basis.

**Finance Plan** means the finance plan for the Picture attached as Schedule 2.

**Financier/s** means any investor, funder, screen agency or financier, including any gap financiers, that provides funding to pay for the development or the negative cost of the Picture.
**Interest** means interest payable on the Loan Facility calculated in accordance with clause 4.
**Investor** means any investor, funder, screen agency or financier that provides funding to pay for the development or the negative cost of the Picture.

**Producer Offset** means any payable cash element constituting a refundable tax credit.

**Reports** means all customary reports, including production and costs reports, required to be provided by the Borrower pursuant to any financing agreement, any production and investment agreement or any debt funding arrangement.

**Secured Indebtedness** means all monies that the Borrower is currently or in the future

liable or contingently liable to pay to the Lender under this Agreement, including without limitation: the Loan Amount, Interest and Expenses.

**Security Interest** includes any:

(a) mortgage, pledge, lien, charge, encumbrance, option or third-party security;
(b) contractual, proprietary, or preferential interest or arrangement of any kind;
(c) right of or arrangement with any creditor to have its claims satisfied before other creditors from any asset; and

**Transaction Document** means the documents specified as transaction documents or documents that are conditions precedent in any:

(a) loan and security agreement entered into by the Borrower and a Debt Financier; and
(b) financing agreement entered into by the Borrower and a Financier.

**Interpretation**

15.2 In the interpretation of this Agreement, the following provisions apply unless the context otherwise requires:

(a) If the day on which any act, matter or thing is to be done under this Agreement is not a business day, the act, matter, or thing must be done on the next business day.
(b) A reference in this Agreement to 'dollars' or '$' means U.S dollars and all amounts payable under this Agreement are payable in U.S dollars.
(c) A reference in this Agreement to any law, legislation or legislative provision includes any statutory modification, amendment or re-enactment, and any subordinate legislation or regulations issued under that legislation or legislative provision.
(d) A reference in this Agreement to any document or agreement is to that document or agreement as amended, novated, supplemented or replaced.
(e) An expression importing a natural person includes any company, trust, partnership, joint venture, association, body corporate or governmental agency.
(f) A word which indicates the singular also indicates the plural, a word which indicates the plural also indicates the singular, and a reference to any gender also indicates the other gender.
(g) The meaning of general words is not limited by specific examples introduced by "including", "for example" or similar expressions.

**EXECUTED** as an agreement on 10-25 2023

**EXECUTED AS AN AGREEMENT** by 76 & Beyond, LLC **in** the presence of:

Perry C. Alleva
Signature of Authorized Signatory

Perry C. Alleva
Name of Authorized Signatory (Please Print)

**EXECUTED AS AN AGREEMENT** by **Arclight Films International Pty, LLC**
in the presence of:

..............................................................................
Signature of Authorized Signatory

GARY HAMILTON
..............................................................................
Name of Authorized Signatory (Please Print)

# Exhibit "C"

B3520-0693 03/14/2025 11:28 AM Received by California Secretary of State

[redacted]

For Office Use Only

**-FILED-**

File No.: U250119238127

Date Filed: 3/14/2025

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

COGENCY GLOBAL INC
1325 J Street, Suite 1550
Sacramento, CA 95814

2692165 1 of 2

RMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: Arclight Films International Pty, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 8730 Wilshire Blvd. Suite 508 | Beverly Hills | CA | 90211 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: 76 and Beyond, LLC

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 734 Conshohocken State Road | Bala Cynwyd | PA | 19004 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All rights of each and every kind, nature, and character in and to the work currently titled "The Canyon" currently directed by Vaughn Stein and starring Mel Gibson and Bella Thorne (the "Picture"), and all elements thereof, and all Proceeds related thereto, including, without limitation, those relating to the Collateral defined under the Short term loan facility, dated as of October 16, 2023, for the Picture by and between Debtor and Secured Party, as set forth on Exhibit A attached hereto.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

B3520-0694 03/14/2025 11:28 AM Received by California Secretary of State

**EXHIBIT A TO UCC-1**

**COLLATERAL**

All of the Debtor's right, title and interest, in and to (a) all the Debtor's present and after-acquired rights, assets and undertakings, including in the Picture, and including all Circulating and Non-Circulating Assets and (b) if the Picture is made as a Qualifying Film, 100% of the Debtor's entitlement to the proceeds of any Producer Offset; and (c) any and all entitlement of the Debtor to worldwide net profit (as defined in the principal investment agreement for the Picture) from the exploitation of the Picture (collectively, the "**Collateral**"):

(A) "Proceeds" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include all dividends, distributions, or other income from the Collateral, collections thereon or distributions with respect thereto.

(B) "UCC" means the Uniform Commercial Code as in effect from time to time in the State of Pennsylvania, or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

Unless otherwise defined in this Exhibit A or the UCC, all other capitalized terms used herein shall have the meanings ascribed to them in the Loan Facility for a feature film entitled "THE CANYON" (the "**Picture**"), dated October 16, 2023 by and between 76 and Beyond, LLC and Arclight Films International Pty, LLC.

# Exhibit "D"

[redacted]

B3520-0697 03/14/2025 11:28 AM Received by California Secretary of State

For Office Use Only

**-FILED-**

File No.: U250119275226

Date Filed: 3/14/2025

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

C 1 S

COGENCY GLOBAL INC
1325 J Street, Suite 1550
Sacramento, CA 95814

2692165 2 of 2

MATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME: Arclight Films International Pty, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 1c. MAILING ADDRESS: 8730 Wilshire Blvd. Suite 508 | CITY: Beverly Hills | STATE: CA | POSTAL CODE: 90211 | COUNTRY: USA | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME: 76 and Beyond, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS: 734 Conshohocken State Road | CITY: Bala Cynwyd | STATE: PA | POSTAL CODE: 19004 | COUNTRY: USA |

4. COLLATERAL: This financing statement covers the following collateral:

All rights of each and every kind, nature, and character in and to the work currently titled "The Canyon" currently directed by Vaughn Stein and starring Mel Gibson and Bella Thorne (the "Picture"), and all elements thereof, and all Proceeds related thereto, including, without limitation, those relating to the Collateral defined under the Short term loan facility, dated as of October 25, 2023, for the Picture by and between Debtor and Secured Party, as set forth on Exhibit A attached hereto.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

B3520-0698 03/14/2025 11:28 AM Received by California Secretary of State

## EXHIBIT A TO UCC-1

## COLLATERAL

All of the Debtor's right, title and interest, in and to (a) all the Debtor's present and after-acquired rights, assets and undertakings, including in the Picture, and including all Circulating and Non-Circulating Assets and (b) if the Picture is made as a Qualifying Film, 100% of the Debtor's entitlement to the proceeds of any Producer Offset; and (c) any and all entitlement of the Debtor to worldwide net profit (as defined in the principal investment agreement for the Picture) from the exploitation of the Picture (collectively, the "**Collateral**"):

(A) "Proceeds" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include all dividends, distributions, or other income from the Collateral, collections thereon or distributions with respect thereto.

(B) "UCC" means the Uniform Commercial Code as in effect from time to time in the State of Pennsylvania, or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

Unless otherwise defined in this Exhibit A or the UCC, all other capitalized terms used herein shall have the meanings ascribed to them in the Loan Facility for a feature film entitled "THE CANYON" (the "**Picture**"), dated October 25, 2023 by and between 76 and Beyond, LLC and Arclight Films International Pty, LLC.